## Case No. 5,961.

The HALLIE JACKSON.

[Blatchf. Pr. Cas. 41.] [1]

District Court, S. D. New York. Aug., 1861.

ADMIRALTY — FLAG WORN DETERMINES CHARACTER OF VESSEL—BLOCKADE—WHAT CONSTITUTES VIOLATION OF.

1. A vessel is clothed with the character of the flag she wears.

2. Vessel condemned as enemy property, and for an attempt to violate the blockade.

3. A vessel approaching a blockaded port, with intent to violate the blockade, is not entitled to be warned off.

4. Cargo condemned as enemy property. It was also shipped for an enemy port, with intent to violate the blockade.

[Cited in The Amy Warwick, Case No. 341.]

In admiralty.

BETTS, District Judge. The brig Hallie Jackson, her tackle, &c., and the cargo laden on board, were captured on the 10th day of June, 1861, on the high seas, off the coast of Georgia, near Tybee light, by the United States steamship Union, under the command of J. R. Goldsborough, and have been libelled

[1] [Reported by Samuel Blatchford, Esq.]

by the United States and her captors as prize of war, as being enemy's property, and also for attempting to violate and violating the blockade of the port of Savannah, at that time established and existing there, of which the owners of the vessel and cargo had notice. Bernardi Sanchez intervened, and filed his claim as owner of the vessel, but does not state the facts of such ownership, or his residence, or citizenship. He denies the validity of the blockade of the port of Savannah, and although he avoids asserting in terms that he was without notice of the blockade, asserts that the officer who captured the brig seized her "without any previous notification of a blockade," and raises, by exception to the action, the objections alleged in the preceding cases to the authority of the president to declare a blockade or state of war against citizens of the United States, and to the proceedings in the suit. The firm of Arganequi, Gonzales & Co., citizens of Spain, and residents of the island of Cuba, claim the cargo of molasses seized on board the vessel, stating that they chartered the vessel to transport the cargo to Savannah if that port should not be blockaded, and if it was found so, then to some other port of the United States; and they aver that at no time before or at the time of the sailing of the vessel had they any knowledge or notice that the port of Savannah was blockaded.

The register of the vessel at the custom-house, Savannah, on the 20th of April, 1860, was produced in evidence. The proofs, without the aid of that document, are unexceptionably clear that the vessel belonged to a citizen resident in Georgia, and carried impressed upon her more than a constructive character of enemy's property. She had been under the employ of the same owner on voyages between Savannah and Matanzas repeatedly before the one now on inquiry, and in a trade, it seems, under his own direction and for his special account. When she left Savannah, on this last trip, it was after the well-known state of war between the seceding states and the United States was on foot, and the proclamations of the president of April 15, 19, 27, and May 3, 1861, had been issued and were personally known to the ship's company and her owner at Savannah, as appears on the evidence of the first mate upon his examination upon the preparatory interrogatories in this suit, and the expectation of the owner was expressed that the blockade of the Southern ports declared by the president would be directly put in force. The vessel was despatched under the secession flag. She used that flag on her voyage out, in Matanzas when lying in that port, and on her return voyage, until, apprehending it might be perceived by United States vessels, the master ordered the American flag to be substituted. The master, on the approach to him of the capturing vessel, ordered the mate to conceal the secession flag on board the brig, and it was afterwards

found on board the brig and given up to the captors. These facts show not only that the vessel belonged to an enemy, but his purpose to navigate her as such, in defiance of the laws and government of the country to which he owed allegiance.

The doctrine that such use of an enemy's flag is a mark and token of her real ownership is strongly maintained in the English prize court (The Vrow Elizabeth, 5 C. Rob. Adm. 4, 5); and Sir William Scott declares it to be the established rule of law that a vessel is clothed with the character of the flag she wears. Id., note. This brig, when she sailed from Georgia, and when she was seized, was thus plainly enemy's property, and she was properly captured as prize of war. The cargo is claimed by the firm of Arganequi & Gonzales, who are represented to be subjects of the queen of Spain, and neutrals. The evidence to prove the property neutral consists of three particulars: 1st. The test oath and claim, both made by an agent of the claimants, and chiefly on the information of the master; 2d, a charter-party, executed between the claimants and the master of the vessel June 1, 1861; 3d, the bill of lading, dated June 4, 1861. The test oath supplies no fact in confirmation of the alleged ownership of the cargo by the claimants. The first mate and Lee, a seaman, testify, on the preparatory examination, their understanding and belief that it belonged to the owner of the vessel, and would be his if delivered according to its destination. The test witness supposes it to belong to the claiming firm, because he was so informed by the master of the vessel; but the master, on his preparatory examination, fails to state any fact going to establish such ownership, further than the formal shipping of it under a charter-party and bill of lading. The claimants, he says, were strangers to him, and he did not know they were residents at Matanzas. Lee, the seaman, says he supposed the cargo belonged to the owner of the vessel, or to him and his brother, residing at Matanzas.

The bill of lading consigns the cargo from the claimants to the owner of the vessel or assigns. If this document imports, prima facie, that the consignors were proprietors of the goods, yet that intendment is so feeble and inconclusive, particularly in prize cases, as to demand, in any equivocal case, explanations by satisfactory proof produced on the part of the consignor. See the preceding case of The General Green [Case No. 5,312a], and the authorities cited. The charter-party, made almost concomitantly with the bill of lading (the one on the 1st of June and the other on the 4th), would seem to aim at but one object, and that was to obviate the necessity of fulfilling the bill of lading literally as to the place of delivery of the cargo, because, in other respects, the bill of lading is made subordinate to the charter-party, and the latter imparts no privileges or powers to the

takers of the charter-party, in respect to the ship or voyage, not consequent upon the ordinary contract of affreightment, and no security or enhancement of freight or stipulation respecting contingencies of the voyage is arranged in behalf of the givers of the charter-party. The charter-party, however, read in the light of public facts existing at the home port of the vessel, manifestly denotes that the instrument was shaped and executed with the purpose to meet a condition of the blockade of the port of Savannah when the brig should arrive there, and provide relief for her in case she should be shut out from that port. The terms of the arrangement are, that the brig, "being so loaded, shall therewith proceed to Savannah (United States), or so near thereto as she may safely get, and deliver the same to said charterer's agent." The proximity of Matanzas to Savannah, the exciting events occurring throughout the United States, and particularly the Southern ones, and the large commercial intercourse between Cuba and those ports, would leave, as matter of presumption and constructive notice, no doubt that these parties mutually understood the state and manner of hostilities then pending between the United States and all the ports of Georgia, and that the parties in this charter-party contemplated a state of blockade, then subsisting at the port of Savannah, and meant to provide a resource in this stipulation, in case the vessel should not succeed in evading the blockade. The neutral merchant becomes a participator with the enemy in any undertaking or device to violate a blockade, and his property is thereby made to share a common fate with the enemy's itself. That there was, in fact, an effective blockade established at the port on the arrival of the brig is demonstrated by her arrest there; and that she was not entitled to be warned off, if approaching the port with intent to violate it, is abundantly established by the authorities. Wheat. Capt. Mar. 203, 207; Id., 193, 194.

In my opinion, the vessel captured in this case is subject to condemnation: First, as enemy's property at the time of its seizure; secondly, because the vessel wilfully attempted to violate the blockade of the port of Savannah, with knowledge that such blockade existed at the time; thirdly, that, upon the facts and the law applicable to them, the cargo laden on board the vessel was also the property of her owner, and belonged to the enemy; fourthly, if the cargo, on a review of the case, shall be found to belong to the claimants, it was shipped and directed by the claimants to the port of Savannah, with knowledge of the war and notice of the blockade of that port, and with intent to evade and violate such blockade. Judgment is rendered for the condemnation of vessel and cargo, with costs.

An appeal as to the cargo was taken by the claimants to the circuit court, and is still pending. No appeal was taken as to the vessel.